

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

6-19-'42

Gaines County V Terry County at
al, 152 S. W. 509, point 2,
where the court agrees with this
opinion in sofar as it holds the
agreement between the counties
fixing a new boundary line is
void. However, on appeal, the
Supreme Court on yesterday held
since agreement was valid since
the Woods line was not defin-
itely fixed and there was bona fide
as to the true boundary line.        Bryant.

Honorable Alton T. Freeman
County Attorney
Gaines County
Seminole, Texas

Dear Sir:

Opinion No. O-1125
Re:  Authority of a Commissioners'
Court to agree with the Com-
missioners' Courts of other
Counties which adjoin it to
the resurvey and re-establish-
ment of their common line a-
long a line different from the
line "recognized by every one
for all purposes".

This will acknowledge receipt of your letter of July
10, 1939, and its enclosures, requesting the opinion of this
Department, from which we quote as follows:

"A brief history of the matter is that in
1900 Mr. Wood, a State surveyor, presumably at
the order of the Land Commissioner, made a sur-
vey which started at the northwest corner of
Fisher County, I believe, and surveyed west to
the New Mexico State line, designating in said
survey the north line of Gaines and the south
lines of Terry and Yoakum, which survey was fil-
ed and approved by the Commissioner of the Gen-
eral Land Office, and said line was the recognized
boundary line between the above-mentioned counties
by every one for all purposes until 1935. In
1935, A. L. Harris, a surveyor, who resides in
Lubbock, Texas, entered negotiations with Terry
and Yoakum Counties to re-survey the line between
those counties and Gaines County and represented
to them that he could by a survey establish the

COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

fact that their south lines were too far north and that they should have some of the Gaines County territory. Terry and Yoakum County and Mr. Harris then entered negotiations with Gaines County to have a re-survey of the lines. Mr. Harris was contending that the line had never been established. The Commissioners' Courts of all three counties then met and hired Mr. Harris to survey the line and agreed upon the line to be surveyed and adopted a new line between the counties which took off some of Gaines County's territory and gave it to the other counties. The survey was filed in the Land Office and since 1936 has been recognized by the Land Office. We have a different Commissioners' Court now from the one which made these agreements and after investigating the matter the Court now feels that the other court was misinformed by the surveyor and others on the whole matter and especially the question of whether or not the boundary line had been established. We are now contending that the boundary line was established by the survey in 1900 and as recognized and used for all purposes until 1935 and that same should not have been changed as far as Gaines County was concerned upon an agreement prompted by misinformation.

"I am enclosing a copy of all the proceedings had in connection with the survey and change of the boundary line in 1935 which are supposed to be according to authority given counties to agree upon and establish boundary lines in Articles 1582 et seq., Revised Civil Statutes of Texas. Article 1606 also has to do with county boundary lines.

"I am of the opinion that if Gaines County had not entered into the agreement of 1935 for a survey and change of the line we could have held the line to where it was because it was a well established line both by survey recognized in the Land Office for thirty-five years and by all the counties and the question I am trying to settle now is whether or not we can still

hold the old line as the true boundary line
between the counties. This County is contem-
plating a suit if necessary to get the line
back to where it was in 1935 prior to the
change."

You enclosed a copy of an order of the Commissioners'
Court of Gaines County passed on March 5, 1935, which pur-
ported to ratify and confirm the joint verbal action of the
Commissioners' Courts of Gaines, Terry and Yoakum Counties,
by which they "agreed on the following as a true boundary
line between said counties". Also enclosed, was an order
of your Commissioners' Court, which we quote in part:

"On this the 7th day of March, A. D. 1935,
come on to be considered the matter of legally
and permanently establishing the South Line of
Yoakum County, the South Line of Terry County
adjacent to the North line of Gaines County and
the North line of Gaines County, Texas, and it
appears to the court that said boundary line has
never been defined, surveyed, marked and due re-
turns thereof made in accordance with law, and
that the County and Commissioners' Court of Gaines
County, Terry County, and Yoakum County having
met jointly in Brownfield, Texas, on this date
and mutually agreed that the said line should be
surveyed, marked and due returns made permanent-
ly establishing said line by agreement as follows:

"That the South line of Yoakum County and the
North line of Gaines County, and the South line of
Terry County adjacent to said North line of Gaines
County shall hereafter be located along the pre-
sent surveyed sections; the South lines of the fol-
lowing sections 6 and 7 Block a-6 across section
34 and along the South lines of 35A, 35B, 36A, 36B,
37 and 38B Block AX, Sections 28, 29, and 30 Block
C-35, Sections 19 and 20 in Block C-34, Sections 19
and 20 Block C-33, Sections 19 and 20 Block C-32,
Sections 19 and 20 in Block C-31, the NE corner of
Gaines County to be set in said East-West tangent
in line north-south of the NW corner of Dawson

Ionorable Alton T. Freeman, Page 4

County as marked by W. R. Standefer, about 1912, that all lands North of the said South line of said Sections shall hereafter be assessed in Yoakum-Terry Counties and lands South of said South line of said Sections shall be assessed as in Gaines County.

"The Commissioners' of said Counties having jointly employed A. L. Harris, Surveyor of Lubbock, Texas, to mark and make his returns as above set out; wherefore, this Court appoints said Harris to so mark and make his returns thereto as set out in said proposal hereto attached and made a part hereof.

> "W. G. Gibbs, County, Judge,
> Gaines County, Texas."

In order to have more of the facts before us before riting this opinion, we examined the files of the General Land Tice and there found a carbon copy of a letter written by arles Rogan, Commissioner of the General Land Office to Col. , F. Woods, dated May 19, 1900, which referred to enclosures, contract to be signed by Mr. Woods and a bond to be made by m. In that letter the Commissioner said, "You will please tify me when you will start for work, so that I may know when y shall begin. Do not send either bond or contract until the rd of this month, as the law under which this employment and ntract is made does not go into effect until that day." There also a letter in the files written by Woods to the Commissioner, ted July 2, 1900, referring to the progress of the work, asking r certain supplies and help, and for certain field notes which needed in making the survey.

The field notes of the Woods survey are also on file the Land Office with a certificate of Charles Rogan, Commis-oner, dated July 3, 1902, to the effect that "the foregoing eld notes are a true and correct copy from the field book of ate Surveyor D. F. Woods of a line run by him in 1900 from the rthwest corner of Fisher County to the northwest corner of ines County on the line of New Mexico. Said field book now on le in this office."

According to Woods' field notes, he set and marked the rtheast corner of Gaines County with a limestone, marked NWD

Honorable Alton T. Freeman, Page 5


County on east side and NEG County on west side and tied same
into three railroad survey corners, as well as other objects
in the vicinity. From that point, he proceeded west and marked
on the ground, miles 5, 7, 8, 10, 12, 15, 20, 21, 23, 25, 30,
32, 35, 38, 40, 42, 45, 46, 47, 49, and the northwest corner
of Gaines County, same being the southwest corner of Yoakum
County, in the east line of State of New Mexico and tied his
corner into several objects on the ground as well as "a mon-
ument established by Twichell, mile 70 north from southeast
corner of New Mexico, a stone 3" by 12" by 18" long set in the
ground". Typical of Woods' manner of marking miles and
corners on the ground was to dig a pit, build a mound, drive
a stake in it and bury a bottle in the mound containing a
slip of paper describing the point, with the date and his
name and title on it.

Photostatic copies of the letters and Woods'report,
obtained by us from the Land Office, are enclosed herewith.

A copy of the report made by A. L. Harris on his
survey, filed in the General Land Office June 12, 1935, has also
been examined by us, but is not enclosed since you have a copy.

Before answering the single general question contained
in your letter, it is necessary to discuss and answer some other
questions which arise out of your particular fact situation.

One of the earliest decisions of our Supreme Court,
touching on the subject of the surveying and establishing of
boundary lines between counties, and one which is quoted without
exception in subsequent cases, is that of Jones v. Powers, 65
Tex. 207. There, the Court discussed the general Act providing
the manner in which the true position of the line between
counties might be determined, Acts 1879, Ch. 129, p. 137 (Gammels
Laws of Texas, Vol. 8 p. 1437). This Act remains unchanged to-
day. Articles 1582-1590, Revised Civil Statutes of Texas, 1925.
The Court said:

"Under all the laws made for the purpose of
furnishing a method by which the lines of a county
may be actually established upon the ground, it may
be held if the lines have once been definitely fixed
upon the ground by an actual survey made, reported
and approved, as required by the statute, that a
county court has no power to direct another survey
to be made and thereby establish a boundary line

Honorable Alton T. Freeman, Page 6

different from the one established at some former
period. It is only when it may appear to the county
Commissioners' Court, or to the commissioner of the
general land office, that the boundary, or a part
of the boundary of a county 'is not sufficiently
definite and well defined' that action to make it
definite is authorized.

"When a county line has been once run, marked
upon the ground and established in accordance with
law, it cannot be said to be indefinite. It may
be incorrect, but nevertheless well defined. None
of the statutes seem intended to give power from time
to time to county commissioners' courts to correct
what may have been incorrect in the establishment
of a county line on the ground; but seem intended to
give a means by which the line or lines may be made
definite and certain, and when so rendered, in
accordance with the statute, whether correctly run
and marked or not, the statutory declaration that
'the line so run and marked shall thereafter be
regarded as the true boundary line between the
counties', ought to be given full effect and held
as a prohibition to any further action looking to
the establishment of some other line."
(Emphasis ours). (At p. 213).

The above language was quoted with approval in Hunt
County v. Raines County, 116 T. 277, 288 S. W. 805, answering
certified questions and approving C. C. A. opinion reported in
7 S. W. (2) 648.

It is well settled that such a survey, in order to be
legal or lawful, need not necessarily be made according to the
provisions of the general statutory provision above referred to;
such statutory authority is not exclusive. Hale County v.
Lubbock County, 194 S. W. 678 at p. 682 (writ of error dis-
missed); Jones v. Powers, supra; Hunt County v. Raines County,
supra.

Gaines, Terry and Yoakum Counties along with a number
of others were created by dividing Young and Bexar Territories,
Acts Fifteenth Legislature, supra; their boundaries were
described therein but the "usual provisions" (Hunt County v.
Raines County, supra) for surveying and marking their lines
on the ground were omitted. It is well to note here, that the
Act provided for Scurry County to begin at the northwest corner
of Fisher County, Borden County to begin at the northwest corner
of Scurry County, Dawson County to begin at the northwest cor-
ner of Borden County, and Gaines County to begin at the northwest

corner of Dawson County and for the northwest corner of Gaines County to be coincident with the southwest corner of Yoakum County in the 103rd meridian, and that this was the order and manner of location used by Woods.

The Twenty-sixth Legislature at its First Called Session, General Laws of Texas, ch. 11, p. 29 (Gammel's Laws of Texas, Vol. II), passed the Act adjusting and settling the controversy between the permanent school fund and the State of Texas growing out of the division of the public domain, which was approved February 23, 1900, to take effect ninety days after adjournment. Section 3 of the Act provided that certain tracts in certain named counties, including Gaines and Terry, should be surveyed and sectionized under direction of the General Land Office, before being placed on the market for sale. Section 4 authorized the Commissioner of the General Land Office to employ such surveyors as he deemed necessary to "survey, sectionize and return field notes into the General Land Office of such lands" and that such surveyors, if not already under bond, should make a bond to be approved by the Commissioner and payable to the Governor of Texas, conditioned for the faithful performance of his duties as State Surveyor. The Act made an appropriation for this surveying.

In our opinion, it was by authority of the foregoing Legislation that Charles Rogan, then Commissioner of the General Land Office employed Col. D. S. Woods in 1900, to make his survey. So far as the facts before us show, the line between Terry and Gaines Counties had never been surveyed before the Woods survey. Before the Commissioner could properly describe the school lands to be sold in Gaines and Terry Counties, he had to know which counties they were in, which would, of course, necessitate the location of their common line. Therefore, it is our further opinion that the Commissioner's purpose was to have located, established and marked on the ground, the north line of Gaines County and the south line of Terry County, a common line, in order to carry out the mandates of said Act, with reference to the sale and lease of school lands in those counties.

As stated above, the Woods field notes returned to and on file in the Land Office, show that he marked twenty-one of the forty-nine and a fraction miles of the north line of Gaines County. The Woods field notes conclusively show that the line was "marked on the ground," with both natural and artificial

Honorable Alton ₵. Fre═ ╗an, Page 8

objects. The corner marker and most of the intermediate markers meet the requirements of Article 1583, supra, which war then in effect. Therefore, it is our opinion that the north line of Gaines County and the south line of Terry County were definitely established and marked on the ground "in accordance with law", "by an actual survey, made, reported and approved", Jones v. Powers, supra (quotations are language of cited case), and that the Woods line, wherever it is, is the true boundary line between Gaines, Terry and Yoakum Counties.

The order passed by the Commissioners' Court of Gaines County, March 8, A. D. 1935, contains a finding, with reference to the line in question, "that said boundary line has never been defined, surveyed, marked and due returns thereof made in accordance with law". Since we find that Woods did so survey, mark and establish the boundary line, it is our opinion that the court's finding is in error. The order contains no reference to the line surveyed by Woods and from its face, does not show that the court purposed to put its "agreed line" on the old Woods line. The order contains a description of the "agreed line", but from it, we cannot tell whether the line would coincide with the Woods line or not. If the "agreed line" does coincide with the Woods line, then the courts merely did a useless thing insofar as re-establishing the "true line" was concerned; they merely agreed to, from that time on, recognize the "true line" rather than a line which had been erroneously "recognized" as the boundary line.

However, you say that such is not the case, that the line "recognized by everyone" is the Woods line and that the Commissioners' Court order describes a line which lies south of the Woods line. If this be true, the courts sought to "establish" their boundary line along a line different from that which had already been "established". This, they had no authority to do. Jones v. Powers, supra; Hunt Co. v. Raines Co., supra.

As stated, the Commissioners' Court order does not refer to the Woods line; neither does the report filed by A. I. Harris, of his survey, contain any reference to the Woods line. This, in addition to the finding referred to above, leads us to believe that their intention was not to re-locate the Woods line, but to establish a line which had never been established. This being the case, we will pass without answering the question of the effect of the agreement entered into between the counties if their purpose was to agree on the location of the line as sur-

Honorable Alton T. Freeman, Page 9

<u>veyed by Woods</u>.

Another and even stronger reason for the above holding is that the line surveyed by Woods and which we hold to have been marked and established by him on the ground, was "recognized by everyone," including the Commissioners' Courts of the counties named and the General Land Office, which brings your case within the provisions of Article 1606, Revised Civil Statutes of Texas, 1925, a curative statute, which we quote in full:

> "The county boundaries of the counties in this State as now <u>recognized and established</u> are adopted as the <u>true boundaries</u> of such counties, and the acts creating such counties and boundaries are continued in force." (Emphasis ours).

If the Woods line and the "recognized line" are not one and the same and do not coincide, then there might be some doubt as to the applicability of this article; we are basing our opinion on your statement that they are the same.

Any doubt as to the constitutionality of the foregoing statute, which may have arisen as a result of the dissenting opinion in Hunt v. Raines County, (C. C. A.), supra, or the language of the Supreme Court in saying that it was "Constitutional as applied to the case at bar" has been removed. Lynn County v. Garza County, (Com. App. 58 S. W. (2) 24. There are numerous cases cited in the Lynn County case, <u>all of which</u> hold that Article 1606 is applicable to such a case as is before us. This Article is not limited in its application to a line or lines run on the ground in accordance with Articles 1582-1590, supra. Hale County v. Lubbock County (C. C. A.) 194 S. W. 678 (writ of error dismissed); Hunt Co. v. Raines Co, supra.

In discussing Article 1606, supra, in Pecos County v. Brewster County, 250 S. W. 310 (writ of error dismissed) the Court said:

> "Under this article it would be improper for the district court to undertake to change an established and definitely marked boundary line between counties theretofore recognized and established as the true line, and this is true <u>even though the line be incorrectly run</u>." (at p. 312). (Emphasis ours).

Honorable Alton T. Freeman, Page 10

The case also holds that the jurisdiction of the District Court and County Courts is concurrent under the Act of 1897 (supra).

Article IX, Section 1 of the Constitution of the State of Texas, provides that no territory shall be detached from one existing county and attached to another existing county, without a favorable vote of a majority of the electors in each county. The facts do not show that such an election was held. The constitutional limitation just referred to is on the Legislature. The Legislature has complete control over county boundaries, subject only to constitutional limitations upon that power and any control a county has over its boundaries must be given by the Legislature. Hunt County v. Raines County, supra. Obviously, then, the Commissioners Court of Gaines County acted not only without legislative authority, but in a manner which the Legislature cannot authorize because of said limitation. For this further reason, we hold the act of the Commissioners Courts of Gaines, Terry and Yoakum, which "took off some of Gaines County's territory and gave it to the other counties", to be unconstitutional and void.

We now come to the question, which from your letter appears to be troubling you, namely, whether because of its agreement with Terry and Yoakum Counties, Gaines County will be precluded from recovering its territory, lost to them. Since the action of the Commissioners' Court was without any authority and void, the county is not bound by such action. Tarrant Co. v. Rogan (Civ. App.) 125 S. W. 592 (reversed and rendered on other grounds).

In our opinion, in view of the above cited case and the case of Blackburn v. Delta County, 107 S. W. 60 (writ of error refused), Gaines County is not estopped to deny the validity of the 1935 survey. In the Blackburn Case, the court said:

"Unlike natural persons, corporations, whether private or municipal, possess only such powers as are conferred upon them by law; and it would seem a strange doctrine to hold that, when they make contracts in excess of their powers, compliance by them with such contracts will, by estoppel and relation back, supply the power that was wanting in the first instance, even though such lack of power results from a mandatory provision of the Constitution declaring that such power shall not exist. It is not believed that the doctrine of estoppel should

be carried to such an extent."  (at p. 82).

It follows that the answer to the broad question asked by you is that the line established by State Surveyor D. S. Woods in 1900, and recognized as such since that time, is the true boundary line and that Gaines County can "hold its north line" to same.

The facts are most important in a case of this kind, and the facts quoted from your letter, plus those ascertained by us, are the basis of this opinion. This opinion would not necessarily apply, under a different set of facts.

Trusting that this satisfactorily answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By _James Noel_

James Noel
Assistant

JN:LM

APPROVED AUG 31, 1939

_Gerald C. Mann_

ATTORNEY GENERAL OF TEXAS


APPROVED
OPINION
COMMITTEE
BY _____
CHAIRMAN